## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## JONESBORO DIVISION

IN RE:    **SHAWN MICHAEL HUMES and**               **3:10-bk-12140 E**
               **SHIRLEY JEAN HUMES, Debtors**               **CHAPTER 13**

**SHAWN MICHAEL HUMES**                            **PLAINTIFF**

**v.**                           **3:11-ap-01016**

**LVNV FUNDING, L.L.C.**
**HOSTO, BUCHAN, PRATER & LAWRENCE, P.L.L.C.**         **DEFENDANTS**

### MEMORANDUM OPINION AS TO CORE CLAIMS AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO NONCORE CLAIMS

### Table of Contents

PROCEDURAL BACKGROUND ................................................................................. 2

OVERVIEW ................................................................................................................... 3

JURISDICTION ............................................................................................................. 5

FACTS .......................................................................................................................... 10

DISCUSSION ............................................................................................................... 23

   I.   Vicarious Liability ................................................................................ 24

   II.   Fair Debt Collection Practices Act ..................................................... 26

      A.   Violations Based on the Orange Paper and the Phone Conversation ............... 27

      B.   Violations Based on the Amount of the Debt .................................... 33

      C.   Damages for FDCPA Violations ....................................................... 36

   III.   Arkansas Fair Debt Collection Practices Act ..................................... 39

   IV.   Arkansas Deceptive Trade Practices Act ............................................ 41

   V.   Breach of Contract .............................................................................. 42

   VI.   Fraud and Misrepresentation ............................................................... 46

   VII.   Objection to Proof of Claim ............................................................... 48

    A.   Defective Service .................................................................................. 48

    B.   Miscalculation of the Debt .............................................................. 48

  VIII.   Avoidance of Lien ......................................................................... 49

CONCLUSION ............................................................................................ 51

## PROCEDURAL BACKGROUND

On January 28, 2011, Shawn Michael Humes (the "**Plaintiff**" or "**Humes**") filed this adversary proceeding against LVNV Funding, L.L.C. ("**LVNV**"), and Hosto, Buchan, Prater & Lawrence, P.L.L.C. ("**Hosto**") (collectively, the "**Defendants**"). In an *Amended Complaint*, filed March 24, 2011, the Plaintiff alleges that one or both of the Defendants: (1) violated the Fair Debt Collection Practices Act, codified at 15 U.S.C. §§ 1692, et seq. ("**FDCPA**"); (2) violated the Arkansas Fair Debt Collections Practices Act, codified at Ark.Code Ann. §§ 17–24–501, et seq. ("**AFDCPA**"); (3) violated the Arkansas Deceptive Trade Practices Act, codified at Ark. Code Ann. §§ 4–88–101, et seq. ("**ADTPA**"); (4) breached a contractual agreement between the parties; and (5) committed the torts of fraud and misrepresentation. Additionally, the Plaintiff moved the Court to disallow the proof of claim filed by LVNV in the Plaintiff's bankruptcy case, pursuant to 11 U.S.C. § 502(b)(1) of the Bankruptcy Code ("**Code**") and that the Court avoid any judgment lien under Code § 522(h) that the Defendants may have obtained.

On December 20, 2011, the Court entered an *Order Denying Motion For Summary Judgment* (the "**Summary Judgment Order**") in favor of the Plaintiff, *Humes v. LVNV Funding, L.C.C. (In re Humes)*, 468 B.R. 346 (Bankr. E.D. Ark. 2011), and on January 11, 2013, the Court held a trial on the Plaintiff's claims. Joel G. Hargis appeared on

behalf of the Plaintiff, who was also present.  William P. Dougherty appeared on behalf of the Defendants.  At the conclusion of the trial, the parties agreed to file briefs of their closing arguments by January 18, 2013.  Before adjourning, the Court raised the issue of whether some of the Plaintiff's claims were noncore.  The Court asked defense counsel if his clients consented to the Court's entry of a final judgment on the merits of any noncore claim and he requested that he be allowed to file a written decision with the Court.  The Court granted that request, and on January 15, 2013, defense counsel filed a letter with the Court requesting that the Court submit proposed findings of fact and conclusions of law to the District Court to review *de novo*.

## OVERVIEW

Humes incurred credit card debt with Citibank USA, N.A. ("**Citi**").  Citi assigned the debt to LVNV, and LVNV hired Hosto to collect it.  Humes maintains that the debt was repaid.  On behalf of LVNV, Hosto filed a lawsuit against Humes in the District Court of Lawrence County, Arkansas, No. CIV–08–215 (the "**State Court Lawsuit**").  Hosto served Humes with the complaint which had an orange piece of paper (the "**Orange Paper**") attached to it.  The Orange Paper listed Hosto's phone number accompanied by the statement that calling "may avoid the necessity of you appearing in Court or filing an Answer."  Humes called Hosto and spoke with a Hosto employee.  Humes maintains that the employee told him that the lawsuit would "go away" if he entered into a monthly payment plan with Hosto.  Hosto argues that it never had a payment plan with Humes.  However, it is undisputed that after the phone conversation, Humes made 12 monthly payments to Hosto.  It is also undisputed that Hosto obtained a

3

default judgment[1] in State Court (the "**Judgment**") only nine days after Humes made his second monthly payment.  While Humes made monthly payments, Hosto registered the Judgment.  Humes made his 12th monthly payment in November 2009, and Hosto obtained a writ of garnishment in March 2010.  Hosto then garnished Humes's bank accounts (the "**Garnishment**"), depriving Humes of the financial means to support his family.  Humes first became aware that his accounts were frozen after his wife's debit card was declined as she was attempting to buy groceries for the family.  Despite being current on his secured financial obligations and having little unsecured debt, Humes filed bankruptcy to get his account funds released.

After carefully scrutinizing the record and the evidence presented at trial, the Court finds that: (1) Hosto told Humes that the State Court Lawsuit would "go away" by entering into a payment plan with Hosto; (2) Humes entered into a payment plan with Hosto in reliance on Hosto's statement that the State Court Lawsuit would "go away" as a result; (3) Hosto breached the payment plan agreement with Humes; and (4) Hosto deceived Humes into not defending the State Court Lawsuit.  Additionally, the Court finds that Hosto violated multiple provisions of the FDCPA and that Hosto committed common law fraud.  As a result of Hosto's actions, the Court finds that Humes has

---

[1] Unlike a default obtained in federal court, a default entered in state court *is the judgment*.  No further act is needed and no notice to the defendant is required.  *Divelbliss v. Suchor*, 311 Ark. 8, 16, 841 S.W.2d 600, 604 (1992) (interpreting Ark. R. Civ. P. 55).  In contrast, obtaining a default judgment in federal court requires two steps:  first, a default is entered; then, upon application by the plaintiff, the default judgment is entered as a second, separate entry.  *See* Fed. R. Civ. P. 55(a)-(b).

[2] The Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011), calls into question whether the label of a proceeding as "core" in § 157(b)(2) is

incurred damages because he lost the right to counsel and the right to defend in the State Court Lawsuit. The entry of the Judgment damaged Humes's credit rating. Finally, Humes suffered emotional distress for which he should be compensated. The bases of the Court's findings will be explained below after the Court addresses jurisdiction.

## JURISDICTION

The parties agree that the bankruptcy court has jurisdiction over Humes's claims; the Defendants disagree that the bankruptcy court has the authority to enter a final judgment on Humes's claims. The Defendants have not consented to the Court's entry of a final judgment on any of Humes's claims, even though this adversary proceeding involves both core and noncore claims. The bankruptcy court has the authority to enter a final judgment on Humes's core claims, notwithstanding the Defendants refusal to consent. As for Humes's noncore claims, this opinion must be construed as proposed findings of fact and conclusions of law for the District Court to review *de novo*. For the reasons discussed below, the Court finds that Humes's claim to disallow LVNV's proof of claim and Humes's claim to avoid any judgment lien held by the Defendants are core claims. The Court finds that Humes's remaining claims are noncore.

Although the parties do not dispute whether the Court has jurisdiction over this adversary proceeding, the Court "must be satisfied that it has jurisdiction before it turns to the merits of other legal arguments." *Carlson v. Arrowhead Concrete Works*, Inc., 445 F.3d 1046, 1050 (8th Cir. 2006). Federal courts have original and exclusive jurisdiction over all cases "under title 11" of the Code, and original, but not exclusive jurisdiction over all proceedings "arising under title 11, or arising in or related to cases under title 11"

of the Code.  28 U.S.C. § 1334(a)-(b).  Pursuant to 28 U.S.C. § 157(a), proceedings under the Code may be automatically referred to bankruptcy judges for the district by the district court.  With certain exceptions not relevant here, by local rule, the Eastern District of Arkansas has referred all proceedings arising under, arising in, or related to a case under title 11 to the bankruptcy court.  *See* Local Rule 83.1.

A proceeding "arises under" title 11 if the "claim asserted is created by or based on a provision of the Code."  *Frelin v. Oakwood Homes Corp.*, 292 B.R. 369, 376 (Bankr. E.D. Ark. 2003) (citing *Nat'l City Bank v. Coopers & Lybrand*, 802 F.2d 990, 994 (8th Cir. 1986)).  A proceeding "arises in" a case under title 11 if the claim asserted is "not based on any right expressly created by the bankruptcy code but has no existence outside the bankruptcy case."  *Id.* at 376–77.  Finally, to determine whether a proceeding is "related to" a bankruptcy case, a court looks to:

> . . . *whether the outcome of that proceeding could conceivably have any effect on the estate being administered in* bankruptcy . . . An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the bankrupt estate.

*Moffitt v. America's Servicing Co. (In re Moffitt)*, 406 B.R. 825, 831 (Bankr. E.D. Ark. 2009) (quoting *Dogpatch Props., Inc. v. Dogpatch U.S.A., Inc. (In re Dogpatch U.S.A., Inc.)*, 810 F.2d 782, 786 (8th Cir. 1987)) (emphasis in original).

The Court finds that it has either arising under, arising in, or related to jurisdiction over all of Humes's claims.  The Court had jurisdiction to try this adversary proceeding.  First, the Court has arising under jurisdiction over Humes's § 522(h) lien avoidance action.  This action is created by an express provision of the Code and cannot exist

6

outside of bankruptcy. Second, the Court, at minimum, has arising in jurisdiction over Humes's objection to LVNV's proof of claim. A proof of claim objection cannot exist outside of bankruptcy because the proof of claim process only exists inside bankruptcy. *See Fort Wayne Telsat, Inc. v. Simon*, 403 B.R. 590, 593 (Bankr. N.D. Ind. 2009) ("An objection to a creditor's proof of claim . . . is probably best pigeonholed as part of . . . [a bankruptcy] court's 'arising in' jurisdiction."). Finally, the Court has related to jurisdiction over Humes's remaining claims (claims one through five). While these claims are neither based on a provision of the Code, thereby "arising under" title 11, nor are dependent on the bankruptcy case's existence, thereby "arising in" a case under title 11, the outcome of these claims could conceivably effect the administration of the bankruptcy estate because any recoveries on claims before the closure, dismissal, or conversion of Humes's case would become property of the Chapter 13 estate under § 1306(a)(1). *See Price v. America's Servicing Co. (In re Price)*, 403 B.R. 775, 779 (Bankr. E.D. Ark. 2009) (finding "related to" jurisdiction over Chapter 13 debtor's FDCPA and breach of contract claims predicated on prepetition conduct).

Having established jurisdiction, the Court must now determine which claims involve core proceedings and which ones do not. *Id*. at 779–80. Proceedings that "arise under" or "arise in" a bankruptcy case are core proceedings whereas proceedings that are merely "related to" the bankruptcy case are noncore proceedings. 28 U.S.C. § 157(b)–(c); *Frelin*, 292 B.R. at 377; *see also Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d 770, 773–74 (8th Cir. 1995).

Generally in core proceedings, the bankruptcy court may enter final orders and judgments, subject to district court appellate review.  *See* 28 U.S.C. § 157(b)(1).[2]  In noncore proceedings otherwise related to a case under title 11, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court" unless the parties consent to the bankruptcy court's entry of a final judgment.  *Id*. § 157(c)(1)-(2).  The issue here is the bankruptcy court's authority to enter a final judgment on Humes's claims.

The Court has already determined that Humes's § 522(h) lien avoidance action and proof of claim objection are proceedings that "arise under" or "arise in" a case under title 11.  These actions are also "core" and the Court has the authority to enter a final judgment on them.  *See Id*. § 157(b)(2) (providing non-exhaustive list of core proceedings).  However, because the Court only has related to jurisdiction over Humes's remaining claims (claims one through five), these claims are noncore.  The Defendants have not consented to the bankruptcy court's entry of a final judgment on these noncore

---

[2] The Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011), calls into question whether the label of a proceeding as "core" in § 157(b)(2) is dispositive of whether a bankruptcy court may enter a final judgment in that proceeding.  In *Stern*, the Court held that although the bankruptcy court properly determined that it could enter a final judgment on a state law tortious interference counterclaim under 28 U.S.C. § 157(b)(2)(C), 131 S. Ct. at 2601–02, an Article I bankruptcy court, nevertheless, lacks constitutional authority to enter a final judgment when the counterclaim does not "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process."  *Id*. at 2618.  No counterclaims are present here and most courts have held that *Stern* should be narrowly construed.  *See, e.g.*, *Quigley Co., Inc. v. Angelos (In re Quigley Co., Inc.)*, 676 F.3d 45, 52 (2d Cir. 2012); *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 407 (5th Cir. 2012); *Sundale, Ltd. v. Fla. Assocs. Capital Enters.(In re Sundale, Ltd.)*, 499 F. App'x 887, 893 (11th Cir. 2012); *see also Pearson Educ., Inc. v. Almgren*, 685 F.3d 691, 695 (8th Cir. 2012).

claims, and the Court will submit proposed findings of fact and conclusions of law on claims one through five in accordance with 28 U.S.C. § 157(c)(1).[3]

While this is the court's first experience submitting proposed findings of fact and conclusions of law for district court review, the rarity of this experience is not a result of a change in the settled law or of a unique set of facts. This is a standard adversary proceeding where the Plaintiff has asserted noncore related to claims. A defendant is required to state in its answer whether it consents to the bankruptcy court entering a final judgment on noncore claims. Fed. R. Bankr. P. 7012(b) ("If the response is that the proceeding is non-core, it shall include a statement that the party does or does not consent to entry of final orders or judgment by the bankruptcy judge . . . ."). The Defendants did not comply with Rule 7012(b), and, consequently, the Court, *sua sponte*, raised the issue of whether it had the authority to enter a final judgment on Humes's claims after the trial had concluded. In the future, the Court will ensure that parties adhere to Rule 7012(b) to avoid being put in the position of having to determine whether it may enter a final judgment in a case that has just been tried. That was not done in this case, and the Defendants have requested only that which is their right to request. *Id.* The Court now turns to the undisputed facts of the case and the evidence presented at the trial.

---

[3] The Court previously found undisputed facts underlying Humes's noncore claims when it denied the Defendants' motion for summary judgment. A bankruptcy court has the authority to enter an order denying a motion for summary judgment on noncore matters because the order is interlocutory rather than final. *Olsen v. PG Design/Build, Inc. (In re Smeltzer Plumbing Sys., Inc.)*, No. 06–B–72110, 2011 WL 6176213, at *3 (Bankr. N.D. Ill. Dec. 12, 2011); *see O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*, 467 B.R. 734, 738–41 (Bankr. S.D.N.Y. 2012); *see also AP Servs., LLC v. Bellco Drug Corp. (In re CRC Parent Corp.)*, No. 10–11567 MFW, 2013 WL 781603, at *1 (Bankr. D. Del. Mar. 1, 2013) ("The Court has the power to enter an order on a motion to dismiss even if the matter is non-core or the Court lacks authority to enter a final order.").

## FACTS[4]

Humes is 35 years old.  He works in the air-conditioning business and lives with his wife and young son.  Humes incurred debt with Citi, stemming from his use of two Sears credit cards which he used to purchase a refrigerator and other household items in 2004 and 2005.  The debt was owed to Citi pursuant to a credit card membership agreement (the "**Cardholder Agreement**") governed by South Dakota law.  To pay off the debt, Humes and his wife, Shirley Humes, entered into a debt consolidation program in which they made monthly payments to an entity called Freedom Financial.  Freedom Financial billed itself as a service that could help pay off debt while lowering interest rates on credit cards.  The Humeses contend that through Freedom Financial, they paid off the credit card debt owed to Citi.  Despite the Humeses' belief that the debt was paid, Citi assigned $2,576.37 in allegedly outstanding credit card debt owed by Humes to LVNV.  LVNV then hired Hosto to collect the debt from Humes.

### Hosto's Record Keeping and the Humes File

In July of 2008, Hosto began maintaining a record on Humes in the form of a paperless file (the "**Humes File**").  Whoever enters data in a paperless file is labeled the "end user" by Hosto's system, and common data entries are accompanied by "diary codes."  Colleen Martin testified as an authority on Hosto's system of record keeping and as a decipherer of the various Humes File entries.  Martin has worked at Hosto for nine

---

[4] Humes's core and noncore claims are based on one set of facts.  To the extent the facts are relevant to a noncore claim, they are to be construed as proposed findings of fact.

years and is Hosto's Chief Financial Officer and Director of Operations.  Martin is also one of Hosto's custodians of record.

Martin's testimony regarding Hosto's record keeping and the Humes file was revealing.  According to Martin, data entered into a paperless file may come from the accounting department, litigation clerks, and Hosto's own clients.  Martin testified that Hosto's purpose in keeping paperless files is to maintain the accuracy of a Hosto account and to communicate throughout the firm any changes on a day-to-day basis.  She also testified that employees who enter data into a paperless file must undergo mandatory training and instruction.  This training is not evident when reviewing the entries in the Humes File.  For example, the Humes File shows that Hosto's employees attempted to register the Judgment and the writ of garnishment in the wrong county as detailed in Part II.E. of this opinion.[5]  When reviewing the Humes File, the Court found numerous significant inaccuracies and discrepancies.  Based on this review, the Court finds that Hosto's records cannot be trusted or relied on.  The Court provides extensive details to support this finding as it presents the chronology of facts below.

## The State Court Lawsuit

On September 12, 2008, Hosto filed the State Court Lawsuit on behalf of LVNV against Humes.  The complaint stated that Humes owed $2,576.37 in credit card debt and was signed by Gerald D. Boyd ("**Boyd**"), on behalf of Hosto.  Pl.'s Ex. A.  On October

---

[5] Additionally, Martin testified that data entered into a paperless file is listed chronologically and entered data cannot be modified.  However, she could not explain why one Humes File entry dated August 14, 2008, appeared in between several entries dated July 21, 2008.  Dfs.'s Ex. 2.

29, 2008, Humes was served with the complaint.  By that time, the Humeses had ceased making payments to Freedom Financial and were under the impression that they had paid off the credit card debt.

Attached to the complaint was the Orange Paper, stating:

> You have been sued.  If you would like to arrange to pay the debt, please call our law firm at 800-892-1460.  This may avoid the necessity of you appearing in Court or filing an Answer.  When calling, please reference our file number, which is found on the top of Court papers.
>
> Thank you for your cooperation.
>
> This is an attempt to collect a consumer debt and any information obtained will be used for that purpose.  This communication is from a debt collector.

Pl.'s Ex. A.  The 800 number and the letterhead on the Orange Paper were both Hosto's.  Humes had never heard of LVNV before and called the number to determine who LVNV was and to learn more about the documents he received.

Unable to reach anyone on his first try, Humes called Hosto the next day on October 30, 2008, and was connected with an employee who may have identified herself as an account manager (the "**Phone Conversation**").  She explained that the debt referenced in the complaint originated from his Sears credit cards and was previously owed to Citi.  Humes testified that the Hosto employee said that filing an answer would not be necessary if they could arrange a payment plan.  Specifically, when Humes asked what would happen to the complaint, Humes maintains that the employee told him "it would go away."  Humes understood this statement to mean that if he were to make payments to Hosto, he would not have to address the State Court Lawsuit by hiring an

attorney and making any kind of filings.  The Court finds the Hosto employee told Humes that the lawsuit would "go away" if he were to enter into a payment plan.  This finding is supported by the 12 monthly payments Humes subsequently made to Hosto, Humes's credible testimony, various Humes File entries, and the fact that Humes never filed any response to the State Court Lawsuit.  Despite Hosto's repeated denial of ever entering into a payment plan with Humes, neither defendant was able to answer the Court's most basic question: Why would Humes make monthly payments to Hosto if he knew that the State Court Lawsuit would *not* go away?

The Court further finds that during the Phone Conversation, the Hosto employee established a payment arrangement with Humes whereby Humes would make $50 monthly payments to Hosto.  Humes testified he never argued he had paid off the debt through Freedom Financial because he believed it was easier to make monthly payments and get rid of the lawsuit.  The Court believes this explanation.  The Court finds that Humes's testimony that he entered into a payment plan is supported by his conduct: he made monthly payments for a year which Hosto readily accepted.

## The Proposed Consent Judgment

Hosto maintains that it sent Humes a letter on November 17, 2008 (the "**Boyd Letter**") accompanied by a consent judgment for him to sign (the "**Proposed Consent Judgment**").  Hosto submitted its copy of the Boyd Letter and the Proposed Consent Judgment into evidence.  Humes denies receiving either document.  The Boyd Letter states:

Dear Sir/Madam:

13

> Pursuant to your request, please find enclosed the Consent Judgment that was discussed with you.  Please return original signed Consent Judgment within (10) ten days of the date of this letter in the self-addressed stamped envelope along with your initial payment.  If the original, signed Consent Judgment, is not returned before your court date, this matter will not be taken off the docket.
>
> Sincerely,
>
> HOSTO, BUCHAN, PRATER & Lawrence, P.L.L.C.
>
> Joel D. Boyd

Pl.'s Ex. C.  Martin explained that the Boyd Letter was a standard form letter used by Hosto in 2008.

The Proposed Consent Judgment references the case number of the State Court Lawsuit and lists LVNV as the plaintiff and Humes as the defendant.  Paragraph 2 of the Proposed Consent Judgment states that Humes had notice of the State Court Lawsuit and purported to waive any issues regarding service.  Pl.'s Ex. C.  Paragraph 3 purports to enter a judgment against Humes for $2,576.37 plus servicing fees of $100 and attorney's fees of $386.46, all of which would bear a post judgment interest rate of 10 percent.  Paragraph 4 provided:

> It is understood that all payments provided will be credited towards the balance of the account.  However, defendant appears advised that payments will not stay the plaintiff from satisfying this judgment by garnishment of wages and bank account and/or the sale of property of defendant appears.

The Proposed Consent Judgment contains unsigned signature lines for Humes, Boyd, and a judge.  According to Martin, the Proposed Consent Judgment was a form document that Hosto would send a debtor after a debtor indicated that it wanted to set up a payment

14

arrangement.  When asked if Hosto would send consent judgments to debtors that had

called Hosto's 800 number on the Orange Paper Humes received, Martin replied:

> A      I believe so.  We would send the consent judgment if we
> believed that they were interested in entering a payment
> arrangement.
>
> Q      You would send that if you believed that they were interested
> in entering into a payment arrangement?
>
> A      Yes.
>
> Q      Thank you.  Even though paragraph four [of your form
> consent judgment] states that it doesn't waive your right to
> garnish?
>
> A      That's correct. Process of law.

Transcript of Record at 198.

On November 19, 2008, an end user named Lisa whom Martin identified as a

former Hosto employee[6] made the following entry in the Humes File: "icc from dtr verify

mm . . dtr stated he has just rec'd his aj on this account along w his payment tm cl . ."

Dfs.'s Ex. 2.  Martin testified that the first half of this entry means "incoming call from

debtor verify, min[i] [m]iranda . . debtor stated he has just received his agreed judgment."

*See* Transcript of Record at 177.  Martin explained that Hosto used the term "agreed

judgment" synonymously with "consent judgment" or "CJ" and all terms referred to a

form consent judgment Hosto would mail out to debtors.[7]

---

[6] Although Martin testified to supervising Hosto's Human Resources Department, she
could not recall if Lisa left or was terminated.

[7] The Court observes that it understood "mini miranda" to mean that Hosto informed
debtors that it is a "debt collector" under the FDCPA.  There was no evidence to verify this

15

Ultimately, whether or not Humes received the Proposed Consent Judgment is irrelevant because it is undisputed that Humes never signed it.  Having held that Humes entered into a payment plan with Hosto during the Phone Conversion, the Court does not find that Hosto followed its own stated operating procedure of first requiring debtors to sign consent judgments as a perquisite to entering into payment plans.

### The Monthly Payments

Shortly after the Phone Conversation, Humes and his wife made 12 monthly payments to Hosto.  As held in the Summary Judgment Order, the date and amount of each payment were as follows:   November 25, 2008 ($50.00); December 22, 2008 ($50.00); January 30, 2009 ($60.00); February 17, 2009 ($60.00); March 16, 2009 ($60.00); April 14, 2009 ($60.00); May 19, 2009 ($60.00); June 12, 2009 ($60.00); July 16, 2009 ($40.00); August 20, 2009 ($60.00); September 29, 2009 ($60.00); and November 10, 2009 ($60.00).  The first two payments were made by check and applied to filing and processing fees associated with the State Court Lawsuit.  Based on the dates of the first two check payments, Humes testified that the monthly payments were probably due around the 25th of each month.

---

assumption, but the FDCPA requires such a disclosure.  *See* § 1692d(6) (a debt collector is prohibited from "the placement of telephone calls without meaningful disclosure of the caller's identity"), *and*  § 1692e(11) (prohibiting "[t]he failure to disclose [in the initial written or oral communication with the consumer] that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose . . . .").  When the Court reviewed the Humes File entries assuming that "mini miranda" referred to Hosto's disclosure obligations under the FDCPA, the entries made sense.  This assumption inures to the benefit of Hosto.

16

Humes made the nine subsequent payments of $60 over the phone either by giving Hosto his check or debit card number.[8]  After Humes made an over-the-phone payment, a Hosto representative would call Humes back with a confirmation number.  For example, Martin explained that a Humes File entry made on April 14, 2009, meant the following:

> Incoming call from debtor, verify, min[i] miranda. Debtor called in and made monthly payment on account of 60 dollars using debit card, giving payment to Tracy to run and will call debtor back with confirmation number.

Transcript of Record at 187.  After Humes made a payment, an end user would enter a diary code accompanied by the notation "Payment Confirmation Thank you for scheduling your Credit Card payment."  Dfs.'s Ex. 2.  During the course of making his monthly payments, Humes testified he spoke with Hosto representatives on numerous occasions regarding his payment questions.  He maintains that no one from Hosto ever identified themselves as an attorney, advised him to get an attorney, or discussed his legal representation, although Hosto did identify itself as a debt collector in the Orange Paper.

### The Judgment and the Garnishment

On January 20, 2009, 10 days before Humes's third payment, Hosto obtained the Judgment in the State Court Lawsuit, signed by Boyd.  Pl.'s Ex. D.  The Judgment for $2,962.83, consisting of $2,576.37 for principle and interest, and $386.46 for attorney fees.  Paragraph 3 of the Judgment required Humes to file a verification of all his real and

---

[8] Humes testified that these payments were higher because there was a $10 processing fee for payments made over the phone.  He did not know to whom the fees were paid.  Martin testified that a third party processor charged $7 on top of Humes's $60 payments which Hosto never saw.  This dispute over transactional fees need not be resolved for the purposes of this opinion.

personal property with the clerk of the State Court within 45 days of entry of judgment or he could be found in contempt of court. According to Humes, he never received a copy of the Judgment, and, consequently, he never filed the required documents with the State Court clerk.[9] The Court believes Humes never received the Judgment. It is clear from his testimony that if he had known a judgment was entered against him, he would have discontinued making monthly payments.

Despite the entry of the Judgment, an end user repeatedly added and deleted a diary code in the Humes File *nine* times that was accompanied by the notation "HOT Account."[10] When Martin was asked what "hot account" meant, she responded: "I honestly do -- not know what the term is used for on the collection floor." Transcript of Record at 187. As previously stated, Martin has worked at Hosto for nine years and she is one of Hosto's custodians of record. The inability of Martin—Hosto's sole witness and a professed authority on the company's system of record keeping—to identify an

---

[9] The Court is not surprised that Humes testified to never receiving notice of the Judgment. The Arkansas Rules of Civil Procedure do not require notice of the entry of a default judgment to be given to a defendant who has not appeared. *Tharp v. Smith*, 326 Ark. 260, 263–64, 930 S.W.2d 350, 352–53 (1996) (citing *Divelbliss*, 311 Ark. at 16, 841 S.W.2d at 604). The Arkansas Supreme Court has speculated that the rules do not require notice on the theory that "it would be superfluous to again serve a defendant who already received one notice but failed on an ongoing basis to respond." *Divelbliss*, 311 Ark. at 16, 841 S.W.2d at 604. Moreover, in Arkansas, issues decided by default judgment are treated as "actually litigated" for collateral estoppel purposes, whereas in some states, collateral estoppel effect is only given to issues that are actually tried before the state court. *Compare First Sec. Bank v. Hudson (In re Hudson)*, 428 B.R. 866, 870 (Bankr. E.D. Ark. 2010) (Arkansas law), *with EBCO Constr. Grp., LLC v. Garretson (In re Garretson),* 377 B.R. 214, 220 (Bankr. E.D. Ark. 2007) (Missouri law). Therefore, any defenses Humes could have raised in the State Court Lawsuit concerning the credit card debt assigned by Citi (*e.g.*, full payment to Freedom Financial) were "actually litigated" once the default judgment was obtained.

[10] The "Hot Account" entries span from December 15, 2008, to January 27, 2009. Dfs.'s Ex. 2.

18

important entry used nine times on a routine collection file leads the Court to believe that Martin's testimony was heavily influenced by her commitment to her employer and her desire to influence the Court to rule in Hosto's favor. The Court does not find her inability to define "Hot Account" credible.

The Humes File also chronicles Hosto's apparent inattention to detail and general incompetence in registering the Judgment and obtaining the Garnishment. Humes File entries from May 2009 to October 2009 indicate that Hosto repeatedly tried unsuccessfully to register the Judgment. *See* Dfs.'s Ex. 2. For example, one entry dated October 15, 2009, says "CHECK VOID" with the reason being "wrong court." Below this entry is a notation saying "Register Judgments REVERSAL." When Hosto did register the Judgment, Humes File entries made in January and February 2010 establish that Hosto filed the writ of garnishment in the wrong county. The Paris County Circuit Court apparently returned Hosto's writ of garnishment and informed them that the Judgment entered against Humes was entered in a Lawrence County Circuit Court.

Finally, on March 12, 2010, over a year after the Judgment was entered and four months after Humes made a monthly payment, Hosto obtained the Garnishment against Humes and Iberia Bank in favor of LVNV. The Garnishment indicates that a copy was to be sent to Humes at his residential address, Pl.'s Ex. E, but Humes could not recall receiving a copy before his bankruptcy case was filed. Clearly, he did not know that a garnishment was filed.[11] Pursuant to the Garnishment, two holds were placed on

---

[11] Humes's testimony about his shock and humiliation upon discovering that his bank accounts were frozen reinforces this conclusion.

Humes's bank accounts at Iberia Bank.[12]  At the time, Humes shared a bank account with his mother and a checking account with his wife (the "**Spousal Account**").  Humes testified that the Spousal Account contained approximately four to five hundred dollars when it was frozen.  He stated he used the Spousal Account to support his family and he learned the account had been frozen when his wife's debit card was declined when she attempted to buy groceries for the family's dinner.  Shirley Humes further explained there were several customers waiting behind her to buy groceries at the time her debit card was declined.[13]

Humes testified that he was "shocked" upon learning that his accounts were frozen due to a default judgment and a garnishment having been entered against him.  To support his family, including his nine-year-old son and mother, Humes had to borrow a thousand dollars from his father.  Humes recalled that this was a humiliating experience:

> Q.   How did it feel when you approached your dad for money?
>
> A.   It's not the easiest thing I've ever done.  Yeah, it wasn't a pleasant experience.
>
> Q.   What do you mean?
>
> A.   Well, a grown man having to go home and ask for money, that's kind of degrading and embarrassing.
>
> Q.   What--when is the last time you asked for money?

---

[12] It is evident from the Humes File that Hosto obtained the locations and the numbers of Humes's bank accounts when they processed his monthly payments.  Dfs.'s Ex. 2.

[13] Defense counsel moved to strike all of Shirley Humes's testimony as being irrelevant and prejudicial.  The Court finds that Shirley Humes's testimony is relevant to the extent it corroborates her husband's testimony and illustrates the emotional distress her husband suffered as a result of the Defendants' actions.

A.      Maybe when we were first married, get start -- starting out.

Q.      How long have you been married?

A.      It will be 17 years in June.

Transcript of Record at 113–14.  Moreover, Humes's parents are divorced and have not spoken to each other for approximately 25 years.  Humes testified that he had to conceal his intention to use the borrowed money to help support his mother from his father. Humes believes that his father would not have lent him money if he knew it would be used to support Humes's mother.  Shirley Humes stated that the family had to eat with her husband's parents and that her husband was too embarrassed to tell his parents why. She testified that the Garnishment and their subsequent bankruptcy led to a communication breakdown in their marriage.

## The Bankruptcy Filing

On March 26, 2010, two weeks after Humes's bank accounts were garnished, the Humeses filed a joint Chapter 13 bankruptcy petition.  Humes maintains that he and his wife filed bankruptcy to stop the garnishment and unfreeze his bank accounts.  He believes that the hold on the Spousal Account lasted for approximately a week.

Nita James, a former paralegal for Humes's counsel, testified that she informed Hosto of his bankruptcy the same day the Humeses filed their petition.[14]  James was unable to produce any emails or faxes reflecting her correspondence with Hosto.

---

[14] Defense counsel objected to James's testimony on the grounds that she would be relying on a computer record that was not going to be admitted into evidence.  The Court permitted a proffer of James's testimony, and James briefly reviewed the record during her testimony.  The Court finds that James's testimony is admissible because the record was used to refresh her recollection.  *See* Fed. R. Evid. 612 (incorporated by Fed. R. Bankr. P. 9017).

21

However, James testified that, based on her regular course of business as a paralegal, she would have asked Hosto for an estimate on when the Humes could expect to have his accounts unfrozen.  Based on an entry in the Humes File, Martin contends that Hosto was first notified of Humes's bankruptcy on March 29, 2010.  On that date, a diary code was entered to prepare a bank garnishment release.  Martin testified that she understood an entry made the following day to mean that the garnishment had been released.

When Humes filed bankruptcy, he had, according to the Humes File, accumulated substantial interest on the Judgment.  From February 2, 2009, to April 1, 2010, 61 entries were made in the Humes File accompanied by the notation "Interest Time Stamp."  Dfs.'s Ex. 2.  Martin explained that this denotes interest that automatically accrues on an account whether pre or post-judgment.  The interest is automatically calculated and then added to the balance of an account.  The first interest entry in the Humes File was for $6.30 and the last interest entry made on April 1, 2010, was for $188.97.  By the Court's calculations, Hosto charged Humes some $6,117.41 in interest over 13 months on a $2,962.83 judgment.[15]  Moreover, Martin testified that she "would have to assume" the April 1, 2010 entry meant that Humes was charged interest on the debt, even though this would have been a postpetition charge.  Martin qualified her answer by saying she would "need to look at the ledger card to make sure that [the charge] actually happened."  Transcript of Record at 193.  Whether Hosto actually charged Humes postpetition interest is not relevant to this opinion.  However, Martin's need to look at a "ledger card" is

---

[15] When adding Hosto's claimed legal fees associated with obtaining the Judgment and the 10 months it took Hosto to then register the Judgment and obtain the Garnishment, Humes's debt balloons to $8,088.78.

highly relevant in that it undermines her previous testimony that Hosto's paperless files provide an accurate and complete picture of a debtor's account.

After Humes filed bankruptcy, Hosto closed the Humes File.  Martin never personally checked with LVNV concerning the amount of the debt Humes owed, but maintained that "[s]omeone employed within our office would have."  Transcript of Record at 188.  On May 14, 2010, a third party agent filed LVNV's proof of claim for $2,175.88.[16]  The proof of claim is for an amount $786.95 less than the Judgment awarding LVNV $2,962.83.  Notably, LVNV's proof of claim does not include the interest charges calculated by Hosto.  Hosto did not assist LVNV in filing its proof of claim and therefore, Martin could not explain the difference in amount between LVNV's proof claim and its Judgment.  LVNV did not list itself as a secured creditor and the claims registry lists the Humeses as having only two other unsecured creditors.  Humes is current on all his secured obligations, including that owed on his two vehicles and his mobile home.

## DISCUSSION

Having addressed the facts, the Court now turns to the claims and defenses of the parties.  For the reasons explained below, the Court finds that Hosto violated the FDCPA and committed common law fraud.  While LVNV cannot be held vicariously liable for these claims, LVNV may be held vicariously liable for Hosto's breach of the contractual

---

[16] The proof of claim was filed by Joyce Montjoy who is listed as "servicing agent" for LVNV.  Montjoy's title is "Bankruptcy Recovery Manager of Resurgent Capital Services."

payment plan Hosto entered into with Humes.  As to Humes's remaining claims, the Court finds that they fail as a matter of law and/or for lack of evidence.

## I.     Vicarious Liability

At the close of trial, defense counsel moved to dismiss Humes's claims against LVNV on the grounds that Humes had not shown, as a matter of law, that LVNV could be held vicariously liable for the acts of Hosto.  The Court declined to rule on the motion at that time, and LVNV renewed this defense in its closing brief.  Humes contends that because LVNV hired Hosto to collect on the debt, Hosto's actions may be imputed to LVNV.

To hold LVNV vicariously liable for the acts of Hosto, the Court must first find that Hosto was LVNV's agent.  *See Jones v. Filler, Inc.*, 43 F. Supp. 2d 1052, 1056 (W.D. Ark. 1999) ("A principal or master may . . . be vicariously liable for the tortious acts of its agent or servant within the scope of the agency or employment.") (quoting *Nat'l Bank of Commerce v. HCA Health Servs. of Midwest, Inc.,* 304 Ark. 55, 58, 800 S.W.2d 694 (1990)).  An agency relationship:

> . . . is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control and that the other consents so to act. In other words, the two essential elements of the definition are authorization and right to control.

*Jumper v. L & M Transp., Inc.*, 296 Ark. 319, 320, 756 S.W.2d 901, 902 (1988) (citations omitted); *see also BE & K Const. Co. v. United Broth. of Carpenters & Joiners of Am., AFL-CIO*, 90 F.3d 1318, 1326 (8th Cir. 1996) ("An essential element of any agency claim is that the asserted principal has the right to control the actions of the asserted

24

agent."). LVNV contends that Humes failed to show that LVNV controlled Hosto. However, under Arkansas law "[i]t is well settled that the acts of an attorney are equivalent to the acts of the client." *Scarlett v. Rose Care, Inc.*, 328 Ark. 672, 675, 944 S.W.2d 545, 547 (1997) (citations omitted); *see Barnes v. Barnes*, 311 Ark. 287, 294, 843 S.W.2d 835, 838 (1992). Moreover, at trial, LVNV did not dispute that: (1) LVNV hired Hosto to collect on the debt allegedly owed by Humes; (2) Hosto filed the State Court Lawsuit and mailed other correspondence to Humes on behalf of LVNV; and (3) Hosto received payments from the Humeses which it applied to the debt. The Court finds that these undisputed facts establish that LVNV authorized Hosto to act on its behalf and that Hosto agreed to act on LVNV's behalf. Therefore, defense counsel's argument that Humes presented no evidence showing that Humes and LVNV directly communicated with one another is irrelevant to whether or not Hosto was LVNV's agent.

Having determined that Hosto was LVNV's agent, the next question is whether Hosto's acts come within the scope of the agency relationship. In Arkansas, "[a]bsent fraud, a client is bound . . . by the acts of her attorney within the scope of his authority, even if these acts are negligent." *Scarlett*, 944 S.W.2d at 547 (citing *Self v. Self*, 319 Ark. 632, 637, 893 S.W.2d 775, 779 (1995)). The Court finds that Hosto acted fraudulently, and therefore, Hosto's conduct was outside the agency relationship between Hosto and LVNV. For the reasons discussed more specifically below, the Court finds that Hosto acted intentionally in eliciting payments from Humes while simultaneously pursuing litigation on LVNV's behalf unbeknownst to Humes. The Court finds that Hosto

25

committed common law fraud, and therefore, LVNV cannot be held vicariously liable for any claim asserted against Hosto that requires a finding of tortious conduct.

## II.    Fair Debt Collection Practices Act

Most of Humes's claims are based on the Defendants' alleged violations of the FDCPA.  The purpose of the FDCPA is "to protect consumers from abusive debt collection practices and to protect ethical debt collectors from competitive disadvantage." *Peters v. Gen. Serv. Bureau, Inc.*, 277 F.3d 1051, 1054 (8th Cir. 2002).  "The FDCPA applies to 'attorneys who regularly engage in consumer-debt-collection activity, even when that activity consists of litigation.'"  *Born v. Hosto & Buchan, PLLC*, 2010 Ark. 292, 372 S.W.3d 324, 334 n.5 (2010) (quoting *Heintz v. Jenkins*, 514 U.S. 291, 299, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995)).  However, "[i]t is well-settled that [the] provisions of the FDCPA generally apply only to debt collectors, but not creditors."  *In re Price*, 403 B.R. at 790 (internal quotations and citations omitted); *see also Lester E. Cox Med. Ctr. v. Huntsman*, 408 F.3d 989, 992 (8th Cir. 2005) ("Designation as a debt collector is the starting point for liability under the statute, not the end.").  Therefore, LVNV and Hosto must be "debt collectors" under the FDCPA to be directly liable under the statute.[17]

_____

[17] The FDCPA defines a "debt collector" as:
> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6).  In contrast, a "creditor" is:
> any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another.

26

LVNV argues in its closing brief that Humes failed to present any evidence establishing that LVNV was a "debt collector" under the FDCPA.  Dfs.' Clos. Br. Pg. 2.  With dismay, the Court informs counsel for the Defendants that LVNV and Hosto have conceded that they are debt collectors in their answer.  Dfs.' Ans. to Pl.'s Am. Compl. ¶¶ 9, 12.[18]  As a result, LVNV and Hosto are deemed debt collectors under the FDCPA.[19]

A. Violations Based on the Orange Paper and the Phone Conversation

The Court now addresses Humes's FDCPA claims stemming from the Orange Paper and Phone Conversation which the Court has found to have occurred as alleged by Humes.  These claims are based on §§ 1692d, 1692e, and 1692f.  As noted in the Court's Summary Judgment Order, "each of these provisions contains a non-exhaustive list of conduct that would constitute a violation of that provision, and a single deed can violate more than one provision."  *In re Humes*, 468 B.R. at 353; *see also Clark*, 460 F.3d at 1177; *Knoll v. Allied Interstate, Inc.*, 502 F. Supp. 2d 943, 948 (D. Minn. 2007).  The Court will address these claims somewhat out of order.

---

*Id.* § 1692a(4).  Thus, the FDCPA exempts creditors seeking to collect on their own debts whereas an assignee collecting on a debt that is already in default is not exempt.  *See Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 403 (3d Cir. 2000).  There is a circuit split over whether a principal and its agent must both be debt collectors under the FDCPA to hold the principal vicariously liable for the acts of its agent.  *Compare Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1516 (9th Cir. 1994) (agent only), *with Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 108 (6th Cir. 1996) (principal and agent).

[18] The Court must be able to rely on counsel to know their case, and to argue only those facts which are actually in dispute.

[19] The fact that Hosto is also a law firm does not render it immune from liability under the FDCPA.  The case is not about attorneys acting in their role as "professionals," it is about attorneys acting as "debt collectors."

i.      *Section 1692e*

Section 1692e prohibits a debt collector's use of "any false, deceptive, or misleading representation[s] or means in connection with the collection of any debt." 15 U.S.C. § 1692e.  To determine whether a § 1692e violation has occurred, the Court views the debt collector's communications through the eyes of the unsophisticated consumer. *Peters v. Gen. Serv. Bureau, Inc.,* 277 F.3d 1051, 1055 (8th Cir. 2002). "The unsophisticated consumer test is a practical one, and statements that are merely 'susceptible of an ingenious misreading' do not violate the FDCPA." *Id.* at 1056.  The test "protects the consumer who is uninformed, naive, or trusting." *Morrison v. Hosto, Buchan, Prater & Lawrence, PLLC*, No. 5:09CV00146JLH, 2009 WL 3010917, at *3 (E.D. Ark. Sept. 17, 2009); *see also Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir. 2004) ("[T]he unsophisticated-consumer standard [] is designed to protect consumers of below average sophistication or intelligence without having the standard tied to the very last rung on the sophistication ladder.") (internal quotations omitted).  Moreover, unintentional false representations can violate § 1692e. *See, e.g.*, *Clark*, 460 F.3d at 1176; *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir. 2003); *see also Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996) ("Because the Act imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages.").

The Court finds that Hosto violated § 1692e.  Taken alone, the Orange Paper sent to Humes is not false, deceptive, or misleading.  It invites Humes to call Hosto's 800 number if he "would like to arrange to pay the debt."  Pl.'s Ex. A.   According to the

28

Orange Paper, calling "may avoid the necessity of you appearing in Court or filing an Answer." These statements could be true: by calling Hosto and arranging to pay the debt, Humes could avoid appearing in court or filing an answer. However, the Orange Paper became false, deceptive, or misleading when coupled with the Phone Conversation. The Hosto employee told Humes that LVNV's complaint would "go away" if he were to enter into a payment agreement to make monthly payments of $50. Humes then made 12 monthly payments to Hosto, all but one of which was for $50 or more. Moreover, Humes made 10 of the monthly payments to Hosto after the entry of the Judgment. As previously stated, the Court does not believe that Humes would make monthly payments to Hosto, knowing that Hosto was simultaneously continuing the prosecution of the State Court Lawsuit against him on behalf of LVNV. Moreover, the Court also finds it even less believable that Humes would knowingly make 10 monthly payments to Hosto after Hosto obtained the Judgment against him (which Humes did).

This case differs materially from *Morrison v. Hosto, Buchan, Prater & Lawrence, PLLC*, where a debtor was sent a notice nearly identical to the Orange Paper, but where there was "no allegation that Hosto ever lulled a debtor into not filing an answer and then moved for a default judgment." 2009 WL 3010917, at *3. What did not happen in *Morrison* is precisely what happened here. Humes testified that he understood "it would go away" to mean that he would not have to hire counsel to address the State Court Lawsuit if he were to make monthly payments to Hosto. The Court finds that under the unsophisticated consumer standard, a trusting consumer would have been susceptible to Humes's interpretation of the Hosto employee's statement. An unsophisticated consumer

29

would have believed that after speaking with the Hosto employee, a payment arrangement had been reached that eliminated the need to appear in court or file an answer as stated in the Orange Paper.  Instead, the complaint did not go away, and as is undisputed by the parties, Hosto obtained the Judgment on behalf of LVNV.  Based on Hosto's assurances, Humes effectively waived his right to counsel and his right to present his array of defenses in the State Court Lawsuit.[20]

Moreover, the Court finds that the Hosto employee acted in accordance with Hosto's deceptive business practices by intentionally misleading Humes into believing that he did not have to file an answer in the State Court Lawsuit.  Hosto pursued a concerted campaign to obtain the Judgment while simultaneously extracting money from Humes.  Despite regularly corresponding with Humes, Hosto never disclosed its plans to obtain a default judgment to Humes.  Martin's testimony further convinces the Court that Hosto acted intentionally. She testified that it is Hosto's general practice to set up payment arrangements with debtors and then mail them proposed consent judgments to sign which, like the Proposed Consent Judgment, contain clauses expressly reserving the right of Hosto's clients to garnish the wages and bank accounts of debtors.  In other words, Hosto negotiates repayment agreements with trusting debtors, and Hosto then attempts to gut those agreements by sending debtors consent judgments to sign under which Hosto retains every available right that a creditor would have as if no payments were made.

---

[20] If Humes had been represented by knowledgeable counsel before the Judgment was entered, the many defenses these facts give rise to may have been raised on Humes's behalf.

Finally, the Court finds that LVNV did not violate § 1692e.  As previously held, LVNV cannot be held vicariously liable because Hosto's intentional conduct is outside the scope of their agency relationship.  LVNV cannot be held directly liable because no evidence was presented establishing that LVNV had any direct communications or interactions with Humes.

ii.     *Section 1692f*

Humes also contends that the Defendants' conduct violated § 1692f.  The general consensus is that § 1692f is a "catch all" provision designed to capture conduct which does not violate another provision of the FDCPA.  *See, e.g.*, *Osborn v. Ekpsz, LLC*, 821 F. Supp. 2d 859, 878 (S.D. Tex. 2011) (collecting authority).  Section 1692f prohibits a debt collector from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt."  Courts have struggled to apply a standard to determine what constitutes "unfair or unconscionable" means to collect on a debt.  *See Beler v. Blatt, Hasenmiller, Leibsker & Moore,* 480 F.3d 470, 474 (7th Cir. 2007) (noting that this phrase "is as vague as they come").  Nevertheless, courts have held that unfairness or unconscionability under § 1692f arises where a debt collector abuses its superior economic position and level of sophistication.  *Adams v. Law Offices of Stuckert & Yates,* 926 F. Supp. 521, 528 (E.D. Pa. 1996); *see Williams v. Javitch, Block & Rathbone, LLP*, 480 F. Supp. 2d 1016, 1023 (S.D. Ohio 2007) (noting two "hallmarks of unconscionability" are a superior economic position and level of sophistication).

The Court finds that Hosto's conduct, alternatively, constitutes an "unfair or unconscionable means to collect or attempt to collect any debt" under § 1692f.  Hosto,

31

with its numerous employees and lawyers, used its superior economic resources and knowledge of the law to induce Humes, an unsophisticated consumer, to give up his legal rights by signing the Proposed Consent Judgment. When that plan failed, Hosto simply obtained the Judgment while it collected monthly payments from an unsuspecting Humes. Thus, if Hosto's conduct somehow does not come within § 1692e, it is captured by § 1692f.

However, because fraudulent conduct also forms the basis of Hosto's § 1692f violation, LVNV cannot be held vicariously liable as a matter of law. Moreover, Humes did not present any evidence that could support a finding that LVNV directly employed "unfair or unconscionable" debt collection methods under § 1692f.

### iii.   Section 1692d

Finally, Humes contends that the Defendants' conduct also violated § 1692d. Section 1692d prohibits a debt collector from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Courts generally look to the enumerated conduct under § 1692d to determine whether a defendant violated the general prohibition of engaging in harassing, oppressive, or abusive conduct. *Kinkade v. Estate Info. Servs., LLC*, No. CV 11–4787(AKT), 2012 WL 4511397, at *9 (E.D.N.Y. Sept. 28, 2012); *Sierra v. Rubin & Debski, P.A.*, No. 10–21866–CIV, 2010 WL 4384216, at *2 (S.D. Fla. Oct. 28, 2010). The six nonexclusive examples under § 1692d are:

> (1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person.

32

(2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.

(3) The publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 1681a(f) or 1681b(3) of this title.

(4) The advertisement for sale of any debt to coerce payment of the debt.

(5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

(6) Except as provided in section 1692b of this title, the placement of telephone calls without meaningful disclosure of the caller's identity.

15 U.S.C. § 1692d. While Hosto's conduct is prohibited under § 1692f or § 1692e, it is not described by any of § 1692d's subsections. The Court finds that the Defendants have not violated § 1692d.

B. <u>Violations Based on the Amount of the Debt</u>

The Court now turns to Humes's claim that the Defendants have falsely represented the amount of the debt owed by Humes in violation of § 1692e(2)(A). This provision states that a debt collector, in connection with the collection of a debt, cannot make a "false representation of the character, amount, or legal status of any debt." § 1692e(2)(A).

First, Humes presented evidence at trial to try and establish that the Defendants did not properly apply the first two $50 payments made to Hosto after the State Court Lawsuit was filed, but before the Judgment was entered. In support of this allegation, Humes noted that the State Court Lawsuit claimed $2,576.37 in damages, yet the Judgment was for the same $2,576.37, although this number includes principal and interest. The Judgment also awards LVNV $386.46 for attorney fees.

The Court lacks jurisdiction to determine whether the Judgment properly reflected the amount of debt owed to LVNV because doing so would run afoul of the *Rooker–Feldman* doctrine.  The *Rooker–Feldman* doctrine stands for the principle that lower federal courts lack subject matter jurisdiction to review a state court judgment because "that appellate function is reserved to the Supreme Court under 28 U.S.C. § 1257." *Dornheim v. Sholes*, 430 F.3d 919, 923 (8th Cir. 2005).  A request to alter a default judgment based on a state court's miscalculation of damages is "precisely the kind of lower federal court appellate review that *Rooker–Feldman* bars."  *Fielder v. Credit Acceptance Corp.*, 188 F.3d 1031, 1035 (8th Cir. 1999).  This is because "[a] state court judgment upholding a damage claim necessarily includes a determination of the damages to be awarded" regardless of whether the judgment was entered by default.  *Id.*; *see also Senftle v. Landau*, 390 F. Supp. 2d 463, 468 n.6 (D. Md. 2005) ("*Rooker–Feldman* [] bars a federal plaintiff from overturning or altering a state court default judgment.") (collecting cases).  Therefore, Humes's FDCPA claims predicated on the State Court's alleged miscalculation of damages are barred by the *Rooker–Feldman* doctrine.

Second, Humes presented evidence attempting to establish that Hosto improperly applied (or did not apply altogether) his monthly payments to the outstanding debt. Consequently, Humes contends that LVNV's proof of claim misrepresents the true amount of the debt he owes.  LVNV clearly did not rely on Hosto's interest calculations in filing its proof of claim, because the amount claimed by LVNV is less than the

Judgment.[21]   LVNV also hired a third party servicing agent rather than Hosto to file its proof of claim.   Moreover, the Court finds, as a matter of law, that a FDCPA claim cannot be predicated on a creditor's filing of a proof of claim.   The Code, case law, and policy dictate such a result.   As noted by the Honorable Stephani W. Humrickhouse:

> If filing a proof of claim constituted a 'collection' activity [under the FDCPA], then filing proofs of claim under § 502(b) would be fundamentally at odds with language in § 362(a)(6) providing that the filing of a petition 'operates as a stay, applicable to all entities, of . . . any act to *collect,* assess, or recover a claim against the debtor that arose before the commencement of the case under this title.'

*Jenkins v. Genesis Fin. Solutions (In re Jenkins)*, 456 B.R. 236, 240 (Bankr. E.D.N.C. 2011) (emphasis in original); *see also McMillen v. Syndicated Office Sys., Inc. (In re McMillen)*, 440 B.R. 907, 912 (Bankr. N.D. Ga. 2010) ("The filing of a proof of claim is a request to participate in the distribution of the bankruptcy estate under court control.   It is not an effort to collect a debt from the debtor, who enjoys the protections of the automatic stay."); *Simmons v. Roundup Funding, LLC*, 62**2** F.3d 93, 95 (2d Cir. 2010); *B–Real, LLC v. Chaussee (In re Chaussee)*, 399 B.R. 225, 244 (B.A.P. 9th Cir. 2008). Additionally, permitting FDCPA claims premised on a creditor's proof of claim filed during bankruptcy "could discourage creditors from filing claims" altogether. *Middlebrooks v. Interstate Credit Control, Inc.*, 391 B.R. 434, 437 (D. Minn. 2008) (quoting *Rice–Etherly v. Bank One (In re Rice–Etherly)*, 336 B.R. 308, 312 (Bankr. E.D.

---

[21] If Hosto's exorbitant interest charges (totaling $6,117.41) had been included in LVNV's proof of claim, then Humes's 10 post-default judgment payments (totaling $580) could not have reduced the balance of the Judgment.

Mich. 2006)).   Humes's FDCPA claims predicated on LVNV's filed proof of claim therefore fail as a matter of law.

### C. Damages for FDCPA Violations

Based on the FDCPA violations, Humes seeks actual damages, statutory damages, costs, and attorney's fees.

#### i.   *Actual Damages*

A debt collector who violates a provision of the FDCPA is liable for "any actual damages sustained by" the plaintiff.   § 1692k(a)(1).   "Actual damages include damages for mental anguish, emotional distress, and humiliation."   *Campbell v. Credit Prot. Ass'n, L.P.*, No. 4:12CV00289AGF, 2013 WL 1282348, at *6 (E.D. Mo. Mar. 27, 2013).   Under the FDCPA, "[a] consumer who has suffered emotional distress has suffered 'actual damage,' even if the emotional distress was not severe."   *Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1041 (D. Minn. 2010), *aff'd*, 413 F. App'x 925 (8th Cir. 2011); *see Jenkins v. E. Asset Mgmt., LLC*, No. 4:08–CV–1032 CAS, 2009 WL 2488029, at *3 (E.D. Mo. Aug. 12, 2009).   In assessing damages under § 1692k(a), a bankruptcy court considers: (1) the frequency and persistence of non-compliance; (2) the nature of such non-compliance; and (3) the extent to which the non-compliance was intentional.   § 1692k(b)(1).

The Court finds that Humes suffered actual damages in the amount of $10,000. Once Hosto obtained the $2,962.83 Judgment, Humes could no longer defend against the

36

State Court Lawsuit.[22]   The Judgment enabled the Garnishment which led to Humes having to file bankruptcy simply to unfreeze the Spousal Account.  The Judgment and bankruptcy filing have irreversibly damaged his credit rating and severely hindered his ability to find a job and qualify for a car or home loan.  *See, e.g.*, Gary Rivlin, *The Long Shadow of Bad Credit in a Job Search*, N.Y. TIMES, May 12, 2013, at BU1; Sharon Goott Nissim, *Stopping A Vicious Cycle: The Problems with Credit Checks in Employment and Strategies to Limit Their Use*, 18 GEO. J. ON POVERTY L. & POL'Y 45 (2010).   The Court's award of actual damages takes into consideration these negative impacts on Humes's future.  Moreover, the actual damages award includes compensation for the anxiety and humiliation the Court finds Humes to have suffered as a result of his having to borrow money from his father and his having to conceal from his father that he would be using the borrowed funds to support his mother.  Hosto must pay Humes $10,000 in actual damages.

ii.    *Statutory Damages*

In addition to actual damages, a plaintiff may be awarded "in the case of any action by an individual, such additional damages as the court may allow" (*i.e.*, statutory damages) up to $1,000.   § 1692k(a)(2)(A).   Statutory damages under the FDCPA are awarded $1,000 per lawsuit, not $1,000 per violation.  *Peter v. GC Servs. L.P.*, 310 F.3d 344, 352 n.5 (5th Cir. 2002); *see also Wright v. Fin. Serv. of Norwalk, Inc.*, 22 F.3d 647, 650 (6th Cir. 1994); *Harper v. Better Bus. Servs., Inc.*, 961 F.2d 1561, 1563 (11th Cir.

---

[22] As previously noted, under Arkansas law notice of the entry of a default judgment need not be given to a defendant who has failed to appear.  *Tharp*, 326 Ark. at 263–64, 930 S.W.2d at 352–53 (citing *Divelbliss*, 311 Ark. at 16, 841 S.W.2d at 604).

1992).  The Court has already determined that Hosto violated § 1692e or, alternatively, 1692f.  The Court finds that Hosto's conduct warrants imposition of the statutory maximum.  Hosto must pay Humes $1,000 in statutory damages.

> iii.    *Costs and Attorney's Fees*

Finally, "in the case of any successful action," a plaintiff may be awarded "the costs of the action, together with a reasonable attorney's fee as determined by the court." § 1692k(a)(3).  Humes incurred costs in the form of his bankruptcy filing fee as well as the percentage fee he must pay the trustee for administering his Chapter 13 plan. Provided that the District Court renders a final judgment adopting this Court's proposed findings of fact and conclusions of law, Humes's counsel will have 14 days from the entry of the District Court's decision to submit an application with the Bankruptcy Court, specifying the costs Humes has incurred.

As for the reasonableness of attorney's fees, courts generally use the lodestar method, which determines the number of hours reasonably expended on the subject matter multiplied by a reasonable hourly rate.  *Quigley v. Winter*, 598 F.3d 938, 957 (8th Cir. 2010); *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983).  The court then "considers[s] certain factors to determine whether the loadstar amount should be adjusted upward or downward.[23]   *Hunter Eng'g Co. v. Hennessy Indus.*, Inc., No. 4:08 CV 465

---

[23] To determine whether an adjustment to the lodestar amount should be made, a court applies the following factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney because of acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the

DDN, 2010 WL 2628336, at *2 (E.D. Mo. June 25, 2010).  When applying the lodestar method to the amount of attorney's fees requested in this case, the Court will give almost no weight to the amount of the State Court default judgment.  If the amount of attorney's fees in debt collection cases were limited to the amount of the debt, then no attorney could afford to represent a debtor like Humes.  The issues presented in this case concern fundamental fairness, which is not measured by debt amounts.  Attorneys deserve to be fairly compensated when representing clients in all income brackets.  Humes's counsel stands ready to file a fee application with the Court which itemizes the numbers of hours he worked and his hourly rate.   Provided that the District Court renders a final judgment adopting this Court's proposed findings of fact and conclusions of law, Humes's counsel will have 14 days from the entry of the District Court's decision to also submit a fee application with this Court.

III.    **Arkansas Fair Debt Collection Practices Act**

The Court now addresses Humes's AFDCPA claims against LVNV.  Enacted in 2009, the AFDCPA is a relatively new statute with virtually no case law interpreting its provisions.  Nevertheless, the AFDCPA appears to be largely modeled on the FDCPA.  Like the FDCPA, only a "debt collector" may be liable under the AFDCPA.[24]   The

---

client or circumstances; (8) amount involved and results obtained; (9) the attorneys' experience, reputation, and ability; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) the awards in similar cases.

*Daugherty v. Cent. Credit Servs.*, No. 4:08CV1967 CDP, 2010 WL 1610388, at *2 (E.D. Mo. Apr. 21, 2010).

[24] The AFDCPA defines "debt collector" as:

Defendants have admitted to being debt collectors under the AFDCPA.  Dfs.' Ans. to Pl.'s Am. Compl. ¶¶ 10, 13.

Humes contends that the facts surrounding the Orange Paper and the Phone Conversation establish that LVNV is vicariously liable for Hosto's violations of the following AFDCPA provisions: § 17-24-506(a) (prohibiting debt collectors from using "a false, deceptive, or misleading representation or means in connection with the collection of a debt"); § 17-24-507(a) (prohibiting a debt collector from "us[ing] unfair or unconscionable means to collect or attempt to collect on a debt"); § 17-24-505(a) (prohibiting debt collectors from "engag[ing] in a conduct the natural consequence of which is to harass, oppress, or abuse a person in connection with the collection of a debt.").[25]   These provisions are nearly identical to §§ 1692e, 1692f, and 1692d of the FDCPA.

If Humes had asserted these violations against Hosto, then the Court, under the facts of this case, would have likely found that Hosto violated §§ 17-24-506(a) and 17-

---

. . . a person who uses an instrumentality of interstate commerce or the mails in a business whose principal purpose is the collection of debts or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

Ark. Code Ann. § 17-24-502(5)(A).  This definition is substantially similar to the FDCPA definition of "debt collector."  *See* 15 U.S.C. § 1692a(6).

[25] Humes also argues in his complaint that LVNV violated § 17-24-506(a)(10) which does not exist.  Humes likely meant to refer to § 17-24-506(b)(10).  This provision states that § 17-24-506(a) is violated when a debt collector uses "a false representation or deceptive means to collect or attempt to collect a debt or to obtain information concerning a consumer."  Ark. Code Ann. § 17-24-506.

24-507(a) of the AFDCPA.[26]   However, Humes has only brought its AFDCPA claims against LVNV.  LVNV cannot be held vicariously liable for Hosto's intentional conduct and no evidence was presented regarding LVNV's own conduct.  Consequently, Humes's AFDCPA claims based on the Orange Paper and the Phone Conversation must fail as a matter of law.

Humes also contends that LVNV violated § 17-24-506(b)(2)(A) which provides that § 17-24-506(a) is violated when a debt collector makes a "false representation of the character, amount, or legal status of a debt."  The factual allegations supporting this claim are the same as Humes's § 1692e(2)(A) FDCPA violations based on the alleged miscalculation of Humes's debt.  The Court similarly finds that this claim must fail as a matter of law based on the *Rooker–Feldman* doctrine and because the filing of a proof of claim cannot constitute the collection of a debt.

## IV.   Arkansas Deceptive Trade Practices Act

The Court now turns to Humes's ADTPA claim against LVNV.  Although "responsibility for civil enforcement of the ADTPA rests largely with the Attorney General," *Wallis v. Ford Motor Co.*, 362 Ark. 317, 208 S.W.3d 153, 161 (2005), "[a]ny

---

[26] The same conduct giving rise to statutory damages under the FDCPA can also give rise to statutory damages under a consistent state consumer protection statute.  *See, e.g.*, *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1066–68 (9th Cir. 2011); *Barnett v. Creditors Specialty Serv., Inc.*, No. 1:12CV303, 2013 WL 1629090, at *2 (W.D.N.C. Apr. 16, 2013) ("[T]he FDCPA preempts only laws that afford consumers less protection than that provided by the FDCPA." (quoting *Desmond v. Philips & Cohen Assocs., Ltd.,* 724 F.Supp.2d 562, 567 (W.D. Pa. 2010))).  The plain language of the FDCPA permits such a cumulative recovery.  *See* 15 U.S.C. § 1692n (providing that only those state laws that are "inconsistent with any provision" of the FDCPA are annulled, altered, or affected by the FDCPA "and then only to the extent of the inconsistency.").  Moreover, because statutory damages are punitive in nature rather than compensatory, a cumulative award does not violate the general rule prohibiting double recovery for the same loss. *Gonzales*, 660 F.3d at 1068; *see also Desmond*, 724 F. Supp. 2d at 567.

person who suffers actual damages or injury as a result of an offense or violation as defined in . . . [the ADPTA] has a cause of action to recover actual damages, if appropriate, and reasonable attorney's fees." Ark. Code Ann. § 4–88–113(f). Specifically, Humes alleges that LVNV violated the catch-all provision of the ADTPA, § 4–88–107(a)(10), which prohibits "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade" that is not listed under the first nine subsections of § 4–88–107(a).

Again, no evidence was presented showing that LVNV engaged in any direct communications or dealings with Humes. Moreover, even if Hosto's intentional conduct could be imputed to LVNV for vicarious liability purposes (which it cannot), Hosto's conduct, as a matter of law, could not constitute a violation of the ADTPA. The Arkansas Supreme Court has held that that the ADTPA does not apply to "the practice of law in undertaking debt collections." *Boyajian v. State*, 2012 Ark. 210, 2–3 (2012); *Bennett & DeLoney, P.C. v. State ex rel. McDaniel*, 2012 Ark. 119, 6–7, 388 S.W.3d 12, 15 & n.4 (2012), *reh'g denied*, (Apr. 26, 2012). It is undisputed that Hosto is a law firm and that it was attempting to collect on Humes's debt. Therefore, Humes's ADTPA claim fails.

## V.    Breach of Contract

The Court now turns to Humes's breach of contract claim against LVNV. The parties agree that the debt incurred by Humes was originally owed to Citi pursuant to the Cardholder Agreement that was governed by South Dakota law. *See In re Humes*, 468 B.R. at 359 & n.8. The issues left for trial were: (1) whether Hosto was LVNV's agent

and had the authority to modify the Cardholder Agreement; (2) if Hosto had the authority to modify the Cardholder Agreement, whether it was orally modified in accordance with South Dakota Law; and (3) if a modification was effected, whether LVNV breached the modified Cardholder Agreement by obtaining the Judgment.[27]

The Court has already determined that Hosto acted as LVNV's agent.  Moreover, LVNV never contended that Hosto lacked the authority to modify the Cardholder Agreement.  Hosto was hired by LVNV, Hosto sent legal correspondence on behalf of LVNV, and Hosto accepted monthly payments on behalf of LVNV.  The Court finds that Hosto had the authority to modify the Cardholder Agreement.

Whether the parties effected a modification of the Cardholder Agreement is a closer question.  South Dakota law permits a written contract to be modified orally, even where the contract contains a provision requiring all modifications to be made in writing. *D.M. Osborne & Co. v. Stringham*, 4 S.D. 593, 57 N.W. 776, 778 (1894).  Specifically, "[a] contract in writing may be altered by a contract in writing without a new consideration or by an executed oral agreement, and not otherwise."  S.D. Codified Laws § 53-8-7.  In other words, a written modification does not need consideration whereas an effective oral modification requires new consideration.  *See Orion Fin. Corp. of S.D. v.*

---

[27] Determining Humes's breach of contract claim does not run afoul of the *Rooker–Feldman* doctrine.  Humes maintains that LVNV breached a modified contract by obtaining the default judgment.  Whether LVNV breached a modified contract has no bearing on—and does amount to a review and a rejection of—the issues necessarily decided by the default judgment. *See MSK EyES Ltd. v. Wells Fargo Bank*, 546 F.3d 533, 539 (8th Cir. 2008) (making this same distinction and holding *Rooker–Feldman* did not apply).  The default judgment established that Humes was liable on credit card debt; the judgment is in no way impacted by this Court's review of Humes's breach of contract claim.

*Am. Foods Grp., Inc.*, 281 F.3d 733, 739 (8th Cir. 2002) (applying South Dakota Law for the proposition that "an oral modification . . . requires additional consideration, or the doing or the suffering of something not required to be done or suffered by the terms of the writing.") (citing *Jones v. Longerbeam*, 22 S.D. 625, 119 N.W. 1000, 1002 (1909)).

Here, under the terms of the unmodified Cardholder Agreement, Humes was required to pay his Sears credit card debt to Citi.  When Citi assigned the debt to LVNV, Humes simply owed any outstanding debt to LVNV instead of Citi and the original terms of the contract remained the same even when LVNV filed the State Court Lawsuit. Humes testified that the Cardholder Agreement with LVNV was modified by the Phone Conversation with the Hosto representative.  If Humes would make monthly payments to Hosto, then Hosto would not press on with the State Court Lawsuit (*i.e.*, the complaint would "go away").  Humes then made monthly payments for nearly a year, even though the Judgment was entered between Humes's second and third payments.  According to Humes, entry of the Judgment constituted a breach of the modified contract.

First, the Court finds that Humes's oral promise to make monthly payments to Hosto and Hosto's acceptance of those monthly payments in return for not pursuing the State Court Lawsuit effected a modification of the Cardholder Agreement between the parties.  LVNV claims that Humes did not provide consideration to support a new or modified contract because Humes was already obligated to pay the debt owed to LVNV. However, LVNV overlooks the fact that Humes provided new consideration in the form of forbearance.  *Bayer v. Burke*, 338 N.W.2d 293, 294 (S.D. 1983) ("[F]orbearance from exercising a right is legal consideration."); *Am. State Bank v. Cwach*, 85 S.D. 562, 566,

44

187 N.W.2d 107, 109 (1971); *see also* Restatement (Second) of Contracts § 74 cmt. d (1981) ("Forbearance to assert a valid claim or a doubtful or honestly-asserted claim may be consideration for a promise, just as surrender of the claim would be.").  Hosto agreed to give up prosecuting the State Court Lawsuit (and make the complaint "go away") and Humes agreed to relinquish any legal defenses he had against LVNV (*e.g.*, full repayment of the underlying debt to Freedom Financial) by making monthly payments which he believed was easier than fighting the lawsuit.  Humes made monthly payments to Hosto, believing that Hosto would not prosecute the State Court Lawsuit.  Thus, the Court finds that there was a modification of the Cardholder Agreement.

Second, the Court finds that LVNV breached the modified contract by obtaining the Judgment when Humes was still current on his monthly payments.  LVNV argues that even if the parties effected a modification, Humes breached the contract by failing to complete the monthly payments.  This is a red herring.  It is black-letter law that "a party first guilty of a substantial or material breach of contract cannot complain if the other party subsequently refuses [or fails] to perform."  17A Am. Jur. 2d *Contracts* § 606; *see Nakdimen v. Baker*, 111 F.2d 778, 781 (8th Cir. 1940).  LVNV first breached the contract by obtaining the Judgment while continuing to accept monthly payments from Humes.  Thus, LVNV cannot now complain that Humes did not complete his performance.

Finally, Humes has suffered damages as a result of LVNV's breach.  However, the Court finds that Humes has already been fully compensated for his loss based on the Court's award of damages pursuant to Humes's § 1692e claim against Hosto.

Consequently, the Court declines to award additional damages for Humes's breach of contract claim.

## VI.   Fraud and Misrepresentation

The Court now turns to Humes's claims that the Defendants committed the torts of fraud and misrepresentation.   Under Arkansas law, the tort of fraud consists of five elements:

> (1) a false representation of [a] material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance.

*In re Humes*, 468 B.R. at 360 (quoting *Fleming v. Cox Law Firm,* 363 Ark. 17, 21, 210 S.W.3d 866, 868–69 (2005)); *see also Moss v. Am. Alt. Ins. Corp.*, 420 F. Supp. 2d 962, 965 (E.D. Ark. 2006).   The Plaintiff has the burden of proving these elements by a preponderance of the evidence.   *S. Bancorp S. v. Richmond (In re Richmond)*, 430 B.R. 846, 863 (Bankr. E.D. Ark. 2010).   As explained earlier, LVNV cannot be vicariously liable for fraud under Arkansas law, *Scarlett*, 328 Ark. at 675, 944 S.W.2d at 547, and there was no evidence to support a conclusion that LVNV acted fraudulently in filing its proof of claim.   The only remaining question is whether Humes proved, by a preponderance of the evidence, that Hosto committed fraud.

The Court finds that Hosto committed fraud.   The Hosto employee knowingly made a false representation of material fact when she told Humes that the State Court Lawsuit would "go away" by entering into a payment plan.   The evidence establishes that Hosto actually intended to continue pursuing the State Court Lawsuit on LVNV's behalf

46

and that Hosto simply used the payment plan as a means to extract money and information from Humes in the meantime. Humes relied on the representation because he made monthly payments instead of filing an answer in which he could assert his defenses. Humes's reliance was justifiable because he had no reason to believe or know that Hosto was proceeding as if there were no agreement while Hosto simultaneously accepted Humes's monthly payments. Humes communicated regularly with Hosto's employees, and they helped facilitate his payments. *See Curtis Lumber Co., Inc. v. La. Pac. Corp.*, 618 F.3d 762, 772 (8th Cir. 2010) (noting fraud "extends to concealment of material information and nondisclosure of certain pertinent information.") (citing *Farm Bureau Policy Holders & Members v. Farm Bureau Mut. Ins. Co. of Ark., Inc.,* 335 Ark. 285, 984 S.W.2d 6, 14 (1998)). Finally, Humes suffered damages as a result of Hosto's false representation because the entry of the Judgment under state law conclusively established Humes's liability on the credit card debt, notwithstanding any defenses Humes could have raised. The elements for misrepresentation under Arkansas law are the same as those for fraud, see *Morrison v. Back Yard Burgers, Inc.*, 91 F.3d 1184, 1186 (8th Cir. 1996), and the Court also finds that Hosto committed the tort of misrepresentation.

As for damages, the Court again finds that Humes has been fully compensated pursuant to the damages the Court has awarded Humes for his § 1692e claim against Hosto. While a court may award punitive damages in particularly egregious cases of fraud, see *Firstbank of Ark. v. Keeling*, 312 Ark. 441, 446, 850 S.W.2d 310, 314 (1993), the Court declines to award punitive damages here.

47

## VII.   Objection to Proof of Claim

Humes objected to LVNV's filed proof of claim and presented evidence seeking to disallow the claim on two grounds.  The Court will address each ground separately.

### A.  Defective Service

Humes tried to establish at trial that because he was not validly served process under Ark. Civ. P. 4, the State Court Lawsuit never commenced, and therefore, the Judgment is void.  Because the debt reflected in LVNV's filed proof of claim is based on the Judgment, Humes argues that the claim is unenforceable under 11 U.S.C. § 502(b)(1).

The success of Humes's claim is predicated on the Court finding that LVNV's claim is unenforceable because it is based on a Judgment obtained through defective service.  A federal court cannot determine whether a state court default judgment was entered against a party that was defectively serviced without violating the *Rooker–Feldman* doctrine.  *In re Knapper*, 407 F.3d 573, 581 (3d Cir. 2005).  This is because determining whether a defendant was properly served requires a federal court to review whether the state court had personal jurisdiction over the defendant.  *Id*.  Consequently, the Court lacks subject matter jurisdiction to determine whether LVNV's proof of claim should be disallowed based on Humes's contention that he was defectively served.

### B.  Miscalculation of the Debt

Alternatively, Humes maintains that LVNV's proof of claim should be disallowed because the Defendants failed to properly calculate the debt.  Humes argues that there are discrepancies between the LVNV's $2,962.83 Judgment and LVNV's $2,175.88 proof of

claim.  Because no one testified as to how LVNV calculated its proof of claim, Humes argues that the LVNV's claim should be disallowed in its entirety.

Based on the evidence presented at trial, the Court cannot explain nor know how LVNV's proof of claim was calculated.  LVNV's proof of claim is for an amount $786.95 less than the Judgment.  Even if all 10 of Humes's post-default judgment payments (totaling $580) were applied to the entirety of the debt (which neither party argued), LVNV's proof of claim would be $206.95 higher than the amount stated. LVNV did not include the $6,117.41 in interest charges that Hosto's records say Humes owed, suggesting that LVNV did not rely on Hosto's record keeping to prepare its proof of claim.  However, the Court will not disallow LVNV's proof of claim in its entirety when the amount stated in the claim is established by a state court judgment and is less than that judgment.

## VIII.  Avoidance of Lien

Lastly, Humes moves to avoid any lien on his exempt property held by LVNV or Hosto pursuant to § 522(h) of the Code.  Section 522(h) enables a debtor to avoid a transfer of property that the debtor could have exempted under § 522(g)(1) if the transfer is avoidable by a trustee under §§ 544, 545, 547, 548, 549, or 724(a) and the trustee does not attempt to avoid the transfer.  Transfers that can be avoided under § 522(h) include the granting of a lien.  *See Mouton v. Toyota Motor Credit Corp. (In re Mouton)*, 479 B.R. 55, 64 (Bankr. E.D. Ark. 2012).  A debtor seeking lien avoidance under § 522 has the burden of proof on all elements, including the very existence of a lien.  *See, e.g.*, *In re*

49

*Indvik*, 118 B.R. 993, 1005 (Bankr. N.D. Iowa 1990); *In re Psick*, 61 B.R. 308, 312 (Bankr.  D. Minn. 1985); *In re Maylin*, 155 B.R. 605, 614 (Bankr. D. Me. 1993).

The only evidence Humes submitted concerning the existence of a lien were the Humes File entries made in the summer and fall of 2009 which indicated that Hosto either registered or attempted to register the Judgment with an Arkansas Circuit Court. LVNV did not assert that it is a secured creditor in its filed proof of claim, and Hosto has not filed a proof of claim in Humes's bankruptcy case.  Although the Humes File shows that Hosto made a concerted effort to obtain a lien, the Court cannot rely on Hosto's abysmal record keeping as conclusively establishing that either Hosto or LVNV in fact obtained a lien on Humes's exempt property.   Furthermore, under the Arkansas Constitution, judgment liens cannot attach to a homestead.  Ark. Const. art. 9, § 3 ("The homestead of any resident of this state . . . shall not be subject to the lien of any judgment or decree of any court . . . ."); *see also Parker v. Johnson*, 368 Ark. 190, 194, 244 S.W.3d 1, 5 (2006) ("The homestead exemption operates as a bulwark which insulates the property to which it applies from the claims of creditors.   Accordingly, when the homestead exemption is successfully asserted in relation to a piece of property, creditors' liens do not attach to that property.").   Therefore, if it is later determined that the Defendants obtained a lien encumbering the Humeses homestead, the Humeses may still move to avoid the lien under § 522(f), *In re Kellar*, 204 B.R. 22 (Bankr. E.D. Ark. 1996), rather than under § 522(h).  Because Humes has not proven the existence of a lien, the Court does not need address whether Humes has met the additional elements of a § 522(h) action.

# CONCLUSION

For the reasons discussed above, the Court submits this memorandum, in its entirety, as its proposed findings of fact and conclusions of law for the District Court's review with respect to Humes's noncore claims.  The Court proposes that the District Court make the following factual findings and legal conclusions on Humes's noncore claims:

(i)    Hosto violated § 1692e or, alternatively, § 1692f of the FDCPA and is liable for $10,000 in actual damages, $1,000 in statutory damages, costs, and attorney's fees.  Provided that the District Court renders a final judgment adopting this Court's proposed findings of fact and conclusions of law, Humes's counsel will have 14 days from the entry of the District Court's decision to submit an application to the bankruptcy court, itemizing Humes's costs and attorney's fees.  The bankruptcy court will then review the application and submit its review as a proposal to the District Court to be added to the final judgment, if accepted.

(ii)    LVNV, through Hosto, its agent, breached a modified contract with Humes. Hosto committed the torts of fraud and misrepresentation.  However, the Court does not find that Humes is entitled to additional damages based on these claims.

(iii)    The Court finds that Humes's remaining noncore claims fail as a matter of law or are not supported by the evidence.

The Court has determined that Humes's objection to LVNV's proof of claim and Humes's § 522(h) lien avoidance action are both core proceedings on which the Court may enter a final judgment.  With respect to these core proceedings, the Court determines that:

(i)      Humes's objection to LVNV's proof of claim is overruled; and

(ii)     Humes's § 522(h) lien avoidance action is denied.

**IT IS SO ORDERED.**

Audrey R. Evans
United States Bankruptcy Judge
Dated:  07/17/2013

CC:  Attorney for Plaintiff(s)
        Plaintiff(s)
        Attorney for Defendant(s)
        Defendant(s)
        Trustee
        US Trustee